**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**PATRICIA THOMSON ROBINSON,**

      **Plaintiff,**

**vs.**                             **CASE NO.  4:06cv25-RH/WCS**

**JO ANNE B. BARNHART,
Commissioner of Social Security,**

      **Defendant.**

                                     **/**

**REPORT AND RECOMMENDATION**

This is a social security case referred to me for a report and recommendation

pursuant to 28 U.S.C. § 636(b) and local rule 72.2(D).[1]  It is recommended that the

decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Patricia Thomson Robinson, applied for disability insurance benefits.

Plaintiff was 50 years old at the time of the administrative hearing, had a 12th grade

---

[1] Plaintiff is not represented by an attorney and brings this suit *pro se*.  She signed her complaint.  Doc. 1.  Plaintiff's memorandum, doc. 7, was filed by her husband, who is not a lawyer, but Plaintiff signed the certificate of service.

education with some college, and had past relevant work as a police officer.  Plaintiff

alleges disability due to osteoarthritis, hearing loss, carpal tunnel syndrome, and chronic

lumbar and cervical strains.

Plaintiff was insured for disability insurance benefits until December 31, 1996.  R.

18.  Therefore, she must show disability occurring on or before that date.

At step 2 of the sequential analysis, the Administrative Law Judge found that

Plaintiff has "severe" impairments of chronic lumbar and cervical strain, carpal tunnel

syndrome bilaterally, hearing loss, and temporomandibular joint disease (TMJ) causing

severe headaches, and that Plaintiff cannot do her past relevant work.  R. 23.  He also

found that Plaintiff has the residual functional capacity to do light work.  R. 26.  Relying

upon Rule 202.21 of the "grids,"[2] he found that Plaintiff could do other work and, thus,

as of December 31, 1996, was not disabled as defined by Social Security law.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

---

[2] The Medical-Vocational Guidelines, 20 C.F.R. § 404.1569, and appendix 2 to
subpart P.

2002).  "If the Commissioner's decision is supported by substantial evidence we must

affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial

deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ.  A reviewing court must view the entire record and take account of

evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed

all evidence and has sufficiently explained the weight he has given to obviously

probative exhibits, to say that his decision is supported by substantial evidence

approaches an abdication of the court's 'duty to scrutinize the record as a whole to

determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662

F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do his previous work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

>   The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

>   1.   Is the individual currently engaged in substantial gainful activity?

>   2.   Does the individual have any severe impairments?

>   3.   Does the individual have any severe impairments that meet or
>        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

>   4.   Does the individual have any impairments which prevent past
>        relevant work?

>   5.   Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

>   Pain and other symptoms reasonably attributed to a medically determinable

impairment are relevant evidence for determining residual functional capacity.  Social

Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or

non-exertional capacity, or both.  Id., p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  "A claimant's subjective testimony supported by medical evidence that satisfies the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence."  Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted).

The reasons articulated for disregarding the claimant's subjective pain testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain standard if his findings "leave no doubt as to the appropriate result" under the law.  Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

**Analysis**

**Plaintiff's testimony**

The hearing before the Administrative Law Judge was held on September 16, 2003.  R. 30.  Plaintiff testified that she drove to the hearing.  R. 34.  She said she drove

about three times a month, and the longest she might drive would be 30 miles one way. *Id.*

Plaintiff said that in 1996, she experienced pain at about level 6 or 7 on a scale of 10 every day.  R. 35.  She said that she did not believe she was on any medications then.  R. 36.  She said that in 1996, she walked for exercise and could walk about a mile.  *Id.*  She said that at that time she could sit for 30 minutes and could lift 8 pounds with difficulty.  *Id.*

Plaintiff said that she had a tremor in the right hand.  R. 37.  She said it "shakes all the time."  *Id.*  She said that in 1996, she did not do any cooking, but washed clothes and ironed.  R. 39.  She could change bedding.  R. 40.  She did not shop.  *Id.*  For hobbies, she read, cross-stitched, and gardened.  R. 41.  She was able to vacuum the floors, watch television, and work on the family budget.  R. 43.  In 1996 she did household chores in intervals because it caused "too many problems" if she did them all at once.  R. 44.

Plaintiff said that in 1996 the pain in her neck radiated down her arms.  R. 45.  The pain was less with less activity.  *Id.*  She said that after carpal tunnel treatment in 1995, the symptoms returned.  R. 45.  She described these symptoms as pain in part of the hand and tingling.  R. 46.

Plaintiff said that she had ringing and decreased hearing in both ears.  R. 46.  In 1996, she suffered "major headaches" from TMJ.  R. 47.  She said that she got these headaches when she did paperwork or did other work requiring thought.  *Id.*  She said that the pain was 9 on a scale of 10 and lasted a week.  *Id.*

**Issues presented in Plaintiff's memorandum**

Plaintiff contends that the Administrative Law Judge erred in failing to find her several physical impairments to be disabling.  She contends that her lumbar condition is not just a "strain," but involves degenerative spinal changes.  Doc. 7, p. 6.  She argues that the TMJ disease that she experiences is a permanent impairment causing dizziness, pain, and migraine headaches.  *Id.*, pp. 6-7.  She argues that although she had surgery for carpal tunnel syndrome on the left, her symptoms returned prior to December 31, 1996.  *Id.*, p. 7.  She notes that while her bilateral hearing loss can be treated by a hearing aid, she has no insurance or financial ability to buy a hearing aid.  *Id.*  She contends that her heart palpitations are caused by mitral valve prolapse, not by anxiety.  *Id.*  She argues that her bilateral ulnar nerve lesions limit the use of her upper extremities and will cause the loss of the use of her hands.  *Id.*  She asserts that the progressive essential tremors that she experiences makes fine hand manipulation nearly impossible, is a hereditary disease, and is a permanent impairment unconnected with anxiety.  *Id.*

**Spinal impairments**

The ALJ relied upon the medical reports and opinions of Drs. Sarafoglu, Meyerson, Blythe, Martin, and Jenkins to conclude that Plaintiff only suffered from chronic lumbar and cervical strain.  R. 22-23.  The evidence related to this conclusion is the following.

Plaintiff was seen by Dr. Theodore Sarafoglu on July 26, 1988.  R. 146.  He found her to be in "mild distress" from neck and back pain.  *Id.*  Upon examination, he found that she had no muscle weakness of the lower or supper extremities, was slightly

Case No. 4:06cv25-RH/WCS

limited on straight leg raising, and had mild limitation of motion of the cervical spine with

paraspinal muscle guarding.  *Id*.  He found "two tiny calcifications in the lumbar spinal

canal without any clinical significance."  *Id*.  X-ray imaging of the spine for June 20,

1988, reported essentially normal findings.  R. 147-149.

Plaintiff returned to Dr. Sarafoglu on September 20, 1988, following a motor

vehicle accident.  R. 145.  She said that she had mild neck pain and left lower back

pain, and intermittent numbness in the left arm and leg.  *Id*.  On examination Dr.

Sarafoglu noted slight limitation of motion of the cervical spine due to paraspinal muscle

guarding, slight limitation in straight leg raising.  *Id*.  He found that her strength and

muscle volume of the arms and legs, gait, and posture were normal.  *Id*.  Dr. Sarafoglu's

diagnosis was mild cervical and lumbosacral sprain.  *Id*.  He released her to light duties

and thought that she could do her regular police duties.  *Id*.

Plaintiff was seen by Dr. Meyerson in December, 1988.  R. 152-153.  Dr.

Meyerson found mild symptoms on examination, with no strength loss.  *Id*.  His

impression was:

> The patient has chronic cervical and lumbosacral strain with some
> radicular symptoms.  There is no evidence clinically to suggest disc
> herniation either in the neck or back.  Studies which have been done
> including MRI of the cervical spine and CT scan of the lumbosacral spine
> in June and October do not demonstrate any disc herniations in the neck
> or back.

R. 153.  Dr. Meyerson said that Plaintiff "is able to work at this time."  *Id*.

The same sort of findings were made by Dr. Blythe a few months later, on

February 27, 1989.  R. 174.  Dr. Blythe noted that Plaintiff had "been seen by a large

number of physicians over the years and these physicians have ruled out the majority of

problems."  *Id.*  He noted the negative MRI and CT scans described above, noting only

"some mild disc degeneration."  *Id.*  He noted that Plaintiff was working as a police

officer in a desk job.  *Id.*  Dr. Blythe found no abnormalities upon physical examination.

*Id.*  His "impression" was "chronic lumbar and cervical strain."  *Id.*  He thought that

Plaintiff should engage in an exercise program for her back and neck problems.  R. 174-

175.  He thought she should continue "at the current time" "at a limited duty status."  *Id.*

Plaintiff was seen again by Dr. Blythe on July 31, 1989, October 9, 1989, and November

15, 1999, with much the same sort of findings.  R. 170-172.  On July 25, 1990, Dr.

Blythe said:

> I believe that her current problems are situations that she will need to
> learn to live with.  She is functioning her [sic] in her light duty type of job in
> a reasonable capacity.

R. 169.

Plaintiff was seen by Dr. Martin on June 19, 1994.  R. 267.  Dr. Martin is a

neurologist.  *Id.*  Dr. Martin found Plaintiff's neck to be "painful to palpation with

restriction of cervical range of motion in all directions."  *Id.*  Strength was normal in both

upper and lower extremities.  *Id.*  Plaintiff had "bilateral Tinel's [sign[3]] at the level of the

wrist."  R. 268.

An x-ray of the cervical spine on July 1, 1994, showed no fracture, subluxation,

disc space narrowing, or significant arthropathy.  R. 269.  The image of the thoracic and

limited lumbar spine showed minimal scoliosis, multiple end plate irregularities felt to be

---

[3] Tinel's sign is "[a] tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at: http://www.mercksource.com (Medical Dictionary link).

"old changes from Schmorl's nodes,"[4] but without evidence of acute fracture or suspicious paraspinal masses. *Id.*

Finally, the ALJ cited notes from Dr. Jenkins, Plaintiff's chiropractor. On March 4, 1996, Dr. Jenkins found no gross motor deficiencies in the upper extremities. R. 452. On March 27, 1996, after traveling to Miami, Plaintiff had restricted cervical extension with pain. R. 455. On July 29, 1996, Plaintiff was found by Dr. Jenkins to have full thoracolumbar range of motion. R. 472. The discomfort in the right SI joint at L5, L4, and L3 was only mild. *Id.*

Plaintiff was seen again by Dr. Jenkins on November 5, 1996. R. 478. He found pain on left cervical rotation, restricted extension with pain, and unrestricted flexion with pain. *Id.* He detected no gross motor weakness in the upper or lower extremities. *Id.* Pain was also detected following thoracolumbar extension, right rotation, and right lateral bending, but the straight leg raising test was negative. *Id.*

Plaintiff was seen by Dr. Jenkins again on December 19, 1996. R. 481. She complained of neck pain with radicular pain into her arms, and headaches. *Id.* Dr. Jenkins detected some tenderness in the lumbar spine, restricted range of motion bilaterally in rotation, extension, and flexion. *Id.* The compression test of the cervical spine caused pain. *Id.* There were no gross motor weaknesses, however. *Id.* Dr. Jenkins's assessment was cervical somatic dysfunction secondary to chronic neck injury. *Id.* His plan was to treat with moist heat and chiropractic adjustment. *Id.*

---

[4] A nodule seen in radiographs of the spine, due to prolapse of nucleus pulposus into an adjoining vertebra. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

In summary, there is insufficient objective medical evidence from the period prior

to 1997 confirming the severity of the alleged pain or of an objectively determined

medical condition that might reasonably be expected to give rise to the claimed pain.

Plaintiff criticizes the weight given by the ALJ to the 1988 opinion of Dr. Sarafoglu, as

the ALJ relied upon the findings that she had only "mild" or "slight" problems.  Doc. 7, p.

1, citing R. 699.  Plaintiff argues that this is contradicted by a finding of "permanent"

impairment in 1983.  This is not an inconsistency.  An impairment may be both mild and

permanent.  To like effect is the criticism of the weight to be afforded the remark of Dr.

Blythe, that "the claimant's problems were situations that she will have to live with."

Doc. 7, p. 5.  This is evidence of a chronic, that is, ongoing, impairment, but the

permanency of the impairment is only the temporal quality.[5]  There remains the question

of severity.  The issue for social security purposes is whether the impairment is

disabling so that the claimant can do no work of any kind.

The Administrative Law Judge discounted Plaintiff's testimony concerning her

limitations in part by finding that:

> At the hearing, the claimant testified that the longest distance she could
> drive during 1995-1996 was 30 miles one way, whereas the medical
> records from Dr. Jenkins reflect that the claimant drove herself from
> Tallahassee to Miami in 1996.

R. 24.  Cited for this finding was the medical record of Dr. Jenkins, Plaintiff's

chiropractor.  *Id.*  and R. 22.  Plaintiff disputes this finding, arguing that she was driven

---

[5] As noted above, an impairment must be sufficiently "permanent" so as to be
expected to last 12 months or more.

to Miami by her husband and she and her husband stopped several times along the

way.  Doc. 7, p. 6.

The medical notation in question does not support the ALJ's finding.  On March

27, 1996, Dr. Jenkins wrote:

> Ms. Robinson comes in today.  She had to *travel* to Miami and back over
> the weekend.  She says *the drive* really seem[ed] to aggravate her neck.
> *She did not really do anything.*  She had no trauma.  She has also had
> headaches and pain in her right hand.

R. 455.  There is little in this note to support a finding that Plaintiff "drove herself" to

Miami.  Indeed, the note that she did not "really do anything" suggests that she was only

a passenger.

Plaintiff argues that she "<u>does not</u> drive more than 80-90 miles to and from

Tallahassee approximately 3 times monthly."  Doc. 7, p. 6.  This argument appears to

be in support of her testimony at the hearing, that she drove perhaps three times a

month, and the longest drive was about 60 miles round trip.  R. 34.

This error, however, does not seriously erode the remainder of the Administrative

Law Judge's reasons for finding that Plaintiff's pain testimony was not credible to the

degree alleged.  In addition to the erroneous finding that Plaintiff drove herself to Miami

and back, the ALJ noted that Plaintiff drove three times a month, ironed clothes, washed

laundry, and changed bed sheets, although she said she was in pain when she

performed those activities.  R. 24.  She also said that in 1996 she walked a mile daily,

cared for her dogs, cross stitched, managed her budget, occasionally vacuumed, and

could lift 8 pounds occasionally.  *Id.*  These findings are supported by substantial

evidence in the record, that is, Plaintiff's testimony.  While evidence of daily activities is

insufficient to discount pain testimony where the medical record indicates otherwise,[6] it

still is important evidence to consider in light of the whole record.  Here, the entire

medical record prior to 1997, considered in conjunction with these daily activities,

indicates an ability, as of 1996, to do work at a greater level than Plaintiff described in

her testimony.

Consequently, the finding of the Administrative Law Judge as to the severity of

Plaintiff's spinal impairments is supported by substantial evidence in the record.  His

conclusion, that Plaintiff's chronic neck and back pain does not prevent her from doing

light work, is a reasonable conclusion based upon the evidence.

**Temporomandibular joint disease**

The ALJ found Plaintiff's TMJ disease to be "severe" at step 2.  It means only

that the effects of TMJ disease were more than minimal.[7]

---

[6] Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work."); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (the court must consider the entire record when determining whether the evidence of a claimant's daily activities is substantial evidence for the conclusion that she retains the residual functional capacity to work); Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("Nor do we believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability or is inconsistent with the limitations recommended by Lewis's treating physicians."); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (when considering daily activities, the entire record must be considered, including the claimant's testimony that she had to lie down after two hours of such work); Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (a conclusory citation to a claimant's "daily activities" as a basis for failing to believe her testimony as to pain was insufficient where there was a medical condition that reasonably could have given rise to the pain described, and, although she testified that she cooked and shopped for herself, she had trouble putting on her clothing).

[7] At step 2 of the analysis, the issue is whether Plaintiff has shown that she has a condition which has more than "a minimal effect on her ability to:  walk, stand, sit, lift, push, pull, reach, carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th

Plaintiff has not pointed to any evidence in the record that TMJ has caused her to have continuing problems with dizziness, pain, and headaches.  The medical record instead indicates Plaintiff has not suffered any significant work-related limitations due to TMJ.  On July 18, 2001, Dr. Sexton, D.M.D., responded to a letter that is not in this record.  R. 235.  He stated that he had last seen Plaintiff for TMJ on June 27, 1995.  *Id.* Thus, Plaintiff's TMJ did not result in any treatment after June, 1995.  Further, Dr. Sexton said that while he released Plaintiff in 1995 with a 3% impairment rating due to TMJ, he said that this condition "should not cause any limitations to the questions asked in your letter dated July 5, 2001."  *Id.* This would indicate that Plaintiff's TMJ did not limit her ability to do work activities in 1996.

### Carpal tunnel syndrome and ulnar nerve lesions[8]

The ALJ found that Plaintiff's "carpal tunnel syndrome produces pain and stiffness in the claimant's arms, hands, and fingers that interferes with her ability to use her hands in a variety of basic work activities."  R. 23.  He relied upon the evidence of treatment from Dr. Vogter.  R. 21.

---

Cir. 1985) (relying on 20 C.F.R. § 404.1521).  "[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), *citing* Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274. "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady).

[8] It is assumed that Plaintiff's claim concerning bilateral ulnar nerve lesions relates to carpal tunnel syndrome.  Plaintiff has not pointed to any evidence in the record showing this to be an impairment distinct from carpal tunnel syndrome.

These findings are supported by substantial evidence in the record.  On January

19, 1995, Dr. Vogter wrote that Plaintiff experienced numbness and tingling in her

hands, with pain in her wrist and some pain radiating up her arm from her wrist to her

elbow.  R. 232.  She had problems gripping objects (she was dropping things) and

buttoning up buttons.  *Id.*  There was no history of neck or radiating arm pain.  *Id.*  Upon

examination, she had hypesthesia[9] subjectively, but motor strength was intact.  *Id.*  She

had positive Phalen''s[10] and Tinel's signs.  *Id.*  She was scheduled for a carpal tunnel

release on January 25, 1995.  *Id.*  In February, 1995, it was noted that after surgery,

Plaintiff was "happy with how things [were] going with the left hand."  R. 229.  There is a

note on April 24, 1995, that Plaintiff decided not to have carpal tunnel release on her

right wrist.  R. 227.  It was also noted that she had pain in the left wrist following

surgery, and Dr. Vogter said he thought that the pain might be the result of arthritis.  *Id.*

He prescribed Advil.  *Id.*

In summary, the medical record supports the ALJ's finding that Plaintiff had

carpal tunnel syndrome, that this syndrome caused pain, and that it interfered with her

ability to use her hands in a variety of work activities.  This, however, was only a step 2

finding that the impairment was "severe."  R. 23.  In other words, it was only a finding

that there was more than a minimal affect upon ability to work cause by carpal tunnel

syndrome.  The ultimate finding that Plaintiff's carpal tunnel syndrome did not

---

[9] Hypesthesia or hypoesthsia:  "Consisting of abnormally decreased sensitivity, particularly to touch.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[10] "Phalen's test is used in carpal tunnel syndrome where forcible palmar flexion of the wrist causes venous engorgement of the canal and an exacerbation of the symptoms."  Gpnotebook, available at www.gpnotebook.co.uk.

significantly impair her ability to do light work is supported by substantial evidence in the record.

**Hearing loss**

The ALJ found that Plaintiff's hearing loss was a "severe" impairment at step 2. He did not find it to be significantly disabling, however.  On May 25, 1995, Plaintiff was examined by Dr. Snider, who found that Plaintiff had mild to moderate bilateral sensorineural hearing loss.  R. 224.  He suggested low gain hearing aids.  *Id.*

Plaintiff argues that she does not have insurance or funds to buy hearing aids. Though evidence of this is not in the record, it will be assumed that this is true.  Still, the degree of disability caused by hearing loss does not appear to be a significant factor for purposes of ability to do work.  Dr. Snider found, at most, only a moderate hearing loss.

**Breathing difficulties and heart palpitations**

Plaintiff argues that the dyspnea[11] and heart palpitations she experiences is caused by mitral valve prolapse, and not by anxiety as Dr. Armstrong thought.  Doc. 7, p. 5.  The only portion of the record mentioned by Plaintiff for this diagnosis is a note by Dr. Armstrong on September 23, 1996, that Plaintiff said she had been diagnosed with mitral valve prolapse in the past.  R. 666.  Upon cardiovascular examination, Dr. Armstrong found that Plaintiff's heart had regular rhythm and rate, without murmurs, rubs, or gallops.  *Id.*  Dr. Armstrong's assessment was that the cause of Plaintiff's heart palpitations could be mitral valve prolapse, high anxiety and stress, or possibly nicotine replacement for smoking cessation.  R. 667.  He also noted that Plaintiff had been

---

[11] Breathlessness or shortness of breath; difficult or labored respiration. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

drinking a very large amount of caffeine.  He said that he "told her that given her history and normal physical examination and ECG, it seemed very like that *the cause of these palpitations were benign cause*."  *Id.*  He also said that medications were available to help her.  *Id.*  Dr. Armstrong concluded that Plaintiff's breathing problems were most likely stress and anxiety related.  *Id.*  He prescribed a trial of Zoloft.[12]  *Id.*

Thus, there is no medical evidence in the record to show that Plaintiff's experience of shortness of breath in fact is caused by mitral valve prolapse.  The ALJ found that Plaintiff's heart palpitations were not a "severe" impairment at step 2.  R. 23.  He noted that Dr. Armstrong "drew a strong connection between the claimant's anxiety and smoking cessation, i.e. activities of finite duration."  *Id.*  In light of the evidence discussed above, these findings are supported by substantial evidence in the record.

### Tremors

Dr. Martin examined Plaintiff on June 29, 1994, after an automobile accident.  R. 267.  He thought that the "episodic tremors" experienced by Plaintiff were secondary to anxiety.  R. 268.  Dr. Martin nonetheless scheduled an EEG and a general screening to rule out intracranial structural pathology and seizure disorder.  *Id.*  He also asked for thoracic and lumbar imaging to rule out fracture or subluxation.  *Id.*  The results of these test are not known.  Thus, there is no evidence of an organic cause for the episodic tremors, or evidence that the tremors occur with such frequency as to impair Plaintiff's ability to do work activity.  There especially does not appear to be any

---

[12] Zoloft is prescribed to treat major depressive disorder, obsessive-compulsive disorder, panic disorder, posttraumatic stress disorder, premenstrual dysphoric disorder, and social anxiety disorder.  PHYSICIANS' DESK REFERENCE (2004), pp. 2891-2892, available from Westlaw.

evidence in the record to support Plaintiff's claim that she has hereditary tremors similar

to Parkinson's disease as claimed in her memorandum.  Doc. 7, p. 5.

**Conclusion**

Thus, considering the record as a whole, the findings of the Administrative Law

Judge are based upon substantial evidence in the record, and those findings were

sufficient to discount Plaintiff's testimony.  Accordingly, the decision of the

Commissioner should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on August 2, 2006.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**